*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JUAN CARLOS RODRIGUEZ,

        Defendant-Appellant.

UNPUBLISHED
October 17, 2025
11:25 AM

No. 367868
Kalamazoo Circuit Court
LC No. 2022-000570-FC

Before: MARIANI, P.J., and MALDONADO and YOUNG, JJ.

PER CURIAM.

Following a jury trial, Juan Carlos Rodriguez was convicted of first-degree criminal sexual conduct (CSC-I) (victim under 13 years old; defendant 17 years of age or older), MCL 750.520b(2)(b); and two counts of second-degree criminal sexual conduct (CSC-II) (victim under 13 years old; defendant 17 years of age or older), MCL 750.520c(2)(b). On appeal, Rodriguez alleges the trial court erred in its handling of a *Batson*[1] challenge and by allowing in irrelevant testimony, that the prosecutor committed misconduct, and that his attorney was ineffective. While we decline to grant Rodriguez a new trial at this juncture, we remand for an evidentiary hearing on the *Batson* issue. We retain jurisdiction.

## I. FACTUAL BACKGROUND

In 2018, Rodriguez married Sulema Arteaga. At the time of the marriage, Arteaga had two children: EM and NM. Rodriguez, Arteaga, and the two children lived together following the marriage. After about four years of living together, in November 2021, Arteaga overheard Rodriguez and EM arguing. EM stated "something around the lines of . . . '[y]ou could go to jail for what you did.' " Arteaga asked EM what Rodriguez could have gone to jail for, and EM responded that Rodriguez "had tried to rape [her]." Arteaga questioned Rodriguez about EM's statements, and he responded with a "blank" expression that he made "when he lie[d]," contrasting

---

[1] *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).

-1-

his everyday generally "reactive" demeanor. Arteaga called the police. Officers Benoit and Gasca of the Kalamazoo Public Safety Department (KPSD) arrived shortly thereafter.

Rodriguez spoke only Spanish, and Officer Gasca was bilingual in Spanish and English. Officer Gasca was not a certified interpreter through the state, and no interpreter was present during the interview. Instead, Officer Gasca herself conducted the interview in Spanish, which was recorded by her body-worn camera. Officer Benoit did not speak Spanish fluently and could not fully understand Officer Gasca's interview with Rodriguez. Rodriguez allegedly told Officer Gasca that he had never inappropriately touched EM, despite having some opportunities to do so, but he had wrestled with EM, during which some touching was accidental. Around 60 days after the interview, the recording of Officer Gasca's interview was erased in a reportedly routine purge by the KPSD. Toward the end of the interview, Officer Gasca told Rodriguez that officers may reach out to speak with him again, and Rodriguez allegedly responded that "he would cooperate and would speak with detectives."

After that initial interview, in January 2022, two KPSD detectives, Detective Kristen Cole and Detective Luis Araujo, interviewed Rodriguez again. This interview was recorded. Detective Cole was the lead investigator but was not fluent in Spanish. Accordingly, she brought Detective Araujo to translate her questions for Rodriguez. Detective Araujo also asked his own clarifying and follow-up questions. The detectives questioned Rodriguez about his statements to Officer Gasca in his initial interview, having reviewed a report Gasca authored following the initial and since-deleted interview.

As for EM, she spent this period of time living with her father in Oklahoma while Arteaga looked and saved for a new place to live. Oklahoma police officers conducted a forensic interview of EM, recorded it, and sent the tape to Kalamazoo Police. Eventually, Arteaga found a new home and EM moved back to Michigan to live with her. In March 2022, EM attended an examination with Dr. Sarah Brown, a child-abuse pediatrician, and Krisanne Cravens, a sexual assault nurse examiner (SANE), at the child-sexual-abuse clinic at Bronson Hospital in Kalamazoo. Dr. Brown did not physically examine EM because EM declined to be examined, and Dr. Brown did not believe that the examination would result in the discovery of any evidence. Dr. Brown ordered sexually-transmitted-infection testing, and EM screened negative for pregnancy, gonorrhea, chlamydia, and trichomoniasis. Dr. Brown was aware that the police were investigating the allegations and that EM had already participated in a forensic interview. Cravens took an oral history from EM in which EM identified Rodriguez as her abuser.

In October 2022, just shy of one year after EM initially came forward to her mother, Rodriguez was charged with one count of CSC-I (victim under 13 years old; defendant 17 years of age or older), MCL 750.520b(2)(b); one count of attempted CSC-I (victim under 13 years old; defendant 17 years of age or older), MCL 750.520b(2)(b); and two counts of CSC-II (victim under 13 years old; defendant 17 years of age or older), MCL 750.520c(2)(b).

Before trial, Rodriguez moved to suppress his statements from the November 2021 interview, through the testimonies of Officer Gasca and Detective Araujo, arguing that the officers

were not qualified interpreters and that the department's failure to preserve evidence was a *Brady*[2] violation. At an evidentiary hearing on the motion, the trial court heard testimony regarding the Spanish-speaking abilities of Officer Gasca and Detective Araujo. Neither obtained formal licensure that qualified them as a court reporter for the state. Officer Gasca spoke Spanish in her home growing up, continued to speak it with her family on a daily basis, and graduated with a bachelor's degree in Spanish. Detective Araujo was born in the Dominican Republic, and his only language was Spanish until he immigrated to the United States when he was five years old.

The trial court also heard the testimony of Vivian Montero, a licensed court interpreter, in which she described her 25-year career spent interpreting for courts, hospitals, and mortgage companies in person and telephonically. She watched the video of the second interview and testified that "significant portions" of Detective Araujo's translation of his interview with Rodriguez were inaccurate based on what Detective Cole told him in English to ask Rodriguez and what he actually asked Rodriguez in Spanish. The trial court subsequently denied Rodriguez's motion to suppress, determining that the police department was not required to provide Rodriguez with a qualified interpreter, that Rodriguez's statements to police were admissible, and that Rodriguez failed to establish a *Brady* violation.

Trial commenced in July 2023. On the second day of trial, while jury selection was still underway, the trial court initiated a voir dire of prospective Juror 11. Juror 11 denied having relevant responses to the questions previously asked of the jury pool or answers "of a personal nature" that he had to address with the judge. Juror 11 denied knowing the attorneys, Rodriguez, or the names of the witnesses. Juror 11 had not served on a jury before, did not speak Spanish, and could be a fair or impartial juror in the case. The prosecution took over the voir dire at that point, and Juror 11 confirmed that he did not have friends or family members who were police officers. He denied "ever" having "any interactions" with police, including scenarios like receiving a speeding ticket or being a witness in a case. He also denied having any experiences that would make him "favorable of police" or "believe someone more because they're a police officer."

Juror 11 also denied having experiences causing a negative opinion of police and denied having experiences that would cause him to believe a "lay-person" over an officer. He did not think that he would "have a hard time judging the credibility" of a 12 to 13-year-old child. He would not "believe someone more or less" because they were a child. He affirmed that he could compare a child's testimony with other evidence in the case. Juror 11 affirmed that he was familiar with the burden of proof and agreed to hold the prosecutor to that standard. He believed that the standard of proof beyond a reasonable doubt was "high enough." He was comfortable finding Rodriguez guilty if the prosecution satisfied all the necessary elements of the offenses and vice versa. Juror 11 agreed to not allow sympathy or speculation to cloud any decisions that he made as a juror. He affirmed that he could find a person guilty on the basis of testimony alone if it proved the elements beyond a reasonable doubt. The prosecution asked if Juror 11 would judge the police on the basis of "their actions in this case not based on what happen [sic] with other officers in other places," and Juror 11 denied that he would, appearing to misunderstand the

---

[2] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

question. After the prosecution clarified, Juror 11 stated, "I won't judge." Defense counsel clarified the prosecution's earlier question regarding whether Juror 11 could evaluate the police's actions based solely on the evidence of their conduct in the present case, and he responded affirmatively that he would consider "[j]ust the evidence."

Juror 11 denied that race or gender would "play a role" in any of his decisions as a juror. Regarding his employment in customer service, Juror 11 described that he would sometimes field complaints about the county agency next door. He affirmed that, when someone was emotional, upset, or stressed, they may "say things in a way that's not maybe the best way to say it." Juror 11 affirmed that he would feel comfortable with a person like himself, "with [his] perspective, [his] background," sitting on a jury in a hypothetical case involving himself. He agreed that he would be comfortable working as a team with his fellow jurors to reach a decision and described himself as a "team player." He affirmed that he could fairly and impartially consider the evidence upon receiving the relevant jury instructions.

Neither party challenged Juror 11 for cause. After the prosecution requested to peremptorily strike Juror 11, there was a bench conference between the prosecutor, defense counsel, and the court, at which defense counsel raised a "concern[] about a potential *Batson* issue." After a brief discussion (discussed more thoroughly below), the bench conference concluded and the trial court excused Juror 11: "[Juror 11], you're going to be excused by the prosecutor. So, thank you for your service today." Eventually, a jury was empaneled.

During trial, EM testified as to multiple incidents of sexual assault. On one occasion when EM was 9 or 10 years old, Arteaga, NM, and Rodriguez were watching a movie; Arteaga and NM were on one couch, and Rodriguez was on the other. EM sat next to Rodriguez, he placed a blanket over the both of them, unzipped her onesie pajamas, and used his hand to touch her breasts and stomach during family movie night. EM initially stated that she was not wearing anything underneath her pajamas, but she later stated that she was wearing underwear and two pairs of shorts underneath. EM did not tell anyone what Rodriguez did to her because she was scared that he would hurt her or that someone would not believe her. EM attempted to avoid family move nights after the incident.

In approximately May 2021, Arteaga and Rodriguez set up an above-ground swimming pool in the backyard of their residence. EM, NM, and Rodriguez used the pool together daily. On one occasion in the summer, while EM, NM, and Rodriguez were in the pool together, Rodriguez swam underneath EM, put her on top of his shoulders, and "slip[ped] his hand underneath [her] bathing suit" when she was 11 years old. EM felt Rodriguez's finger—his thumb—penetrate her vagina while she was on his shoulders. EM again did not tell anyone what happened because she was scared. After that incident, EM began to wear underwear under her bathing suits "just in case [Rodriguez tried] to do it again."

EM additionally testified that at some point in 2021 when she was 11 years old, she and Rodriguez were sitting on a couch in the living room watching television when he "touch[ed] [her] thighs," "got[] down on his knees," "pulled down [her] shorts," and "licked [her] vagina" multiple times. EM "pushed him back," pulled her pants up, and ran upstairs. In another instance, Rodriguez allegedly pushed EM's head down toward his penis and wanted her to perform fellatio on him, but she did not "remember any of the details of how it happened."

-4-

On another occasion, EM wanted to watch the release of a new movie, and Rodriguez laid down next to her on the air mattress in the living room. At some point, Arteaga and NM laid down with them. All four people were lying on the air mattress together watching a movie with a blanket over all of them when Rodriguez grabbed EM's hand, put her hand in his pants, and "made [her] rub" his penis. EM tried to pull her hand away, but he "grabbed it really tightly and pulled it towards him." According to EM, Arteaga told her to stop moving, but EM did not observe Arteaga or her brother notice Rodriguez touching her. EM was too scared to tell anyone about the incident because she did not "know what [Rodriguez] would have done to [her]," and she did not "know what to do at all."

Arteaga also testified at trial. She did not observe any of the aforementioned sexual assaults but noticed that EM did not want to participate in movie nights anymore and would stay in her bedroom. Arteaga also observed that EM stopped swimming in the pool completely after the Fourth of July holiday that year, and EM told Arteaga that she did not want to be in the pool anymore at about that time.

Additionally, Dr. Brown and Cravens each testified about their respective overall qualifications as medical professionals in the field of treating and examining child-sexual-assault victims. Cravens testified that, during the examination, EM shared with Cravens that Rodriguez had "touch[ed] her inappropriately," making motions towards her chest and her genital area. According to Cravens, EM told her that Rodriguez "had rubbed his private on her butt sometimes." Defense counsel objected to Cravens's testimony that provided Rodriguez's identification as irrelevant to EM's medical treatment. That objection was overruled after Cravens testified that Rodriguez's identification would have been pertinent to the ultimate treatment plan for EM, i.e., whether to remove EM from the family home. The jury also heard the testimonies of Detective Cole and Detective Araujo regarding their interview with Rodriguez.

After a six-day jury trial that included an amendment to the felony information, the jury ultimately convicted Rodriguez of one count of CSC-I and two counts of CSC-II. The trial court sentenced Rodriguez to serve 25 to 40 years' imprisonment for the CSC-I conviction and 2 to 15 years' imprisonment each for the two CSC-II convictions, to run concurrently.

Rodriguez moved for a new trial, arguing that the trial court erred by declining to consider Rodriguez's *Batson* objection against the strike of prospective Juror 11. After conducting a hearing on the motion, the trial court denied Rodriguez's request for a new trial, finding that Rodriguez "failed to proffer facts that in sum gave rise to an inference of discriminatory purpose in striking Juror Eleven." Rodriguez now appeals, once again raising the *Batson* concern as well as other legal issues.

## II. *BATSON* VIOLATION

Rodriguez argues that the trial court "failed to properly respond to the [*Batson*] issue" defense counsel raised, impeding his opportunity to develop his prima facie showing of discrimination as required to progress in the *Batson* process. We agree.

In *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), the Supreme Court established a three-step process that applies to our courts for "determining the constitutional propriety of a peremptory challenge." *People v Knight*, 473 Mich 324, 336; 701 NW2d 715 (2005).

"A *Batson* error occurs when a juror is actually dismissed on the basis of race or gender." *Carlsen Estate v Southwestern Mich Emergency Servs, PC*, 338 Mich App 678, 688; 980 NW2d 785 (2021) (quotation marks and citation omitted). "Under the Equal Protection Clause of the Fourteenth Amendment, a party may not exercise a peremptory challenge to remove a prospective juror solely on the basis of the person's race." *Knight*, 473 Mich at 335. See also *Batson*, 476 US at 89. "To establish a *Batson* violation, the opponent of a peremptory challenge must first establish a prima facie showing of discrimination." *Id*. at 689.

The opponent of a peremptory challenge need not prove discrimination at the first step of *Batson*. *Johnson v California*, 545 US 162, 170; 125 S Ct 2410; 162 L Ed 2d 129 (2005). "[S]o long as the sum of the proffered facts gives rise to an inference of discriminatory purpose, *Batson*'s first step is satisfied." *Knight*, 473 Mich at 336-337 (cleaned up). Then, "if the trial court determines that a prima facie showing has been made, the burden shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike." *Id*. at 337. This does not require "articulation of a persuasive reason, or even a plausible one; so long as the reason is not inherently discriminatory, it suffices." *Carlsen Estate*, 338 Mich App at 689 (quotation marks and citation omitted). Third and finally, "if the proponent provides a race-neutral explanation as a matter of law, the trial court must then determine whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination." *Knight*, 473 Mich at 337-338.

The United States Supreme Court and the Michigan Supreme Court have made clear the vital role of the trial court in ensuring this procedure is followed. In *Batson*, the Supreme Court "decline[d] . . . to formulate particular procedures to be followed" after a *Batson* objection, believing trial courts to be capable of handling this administrative duty without too great a burden or difficulty. *Batson*, 476 US at 99. Our Supreme Court has likewise relied on the trial court, finding that "[t]rial courts are in the best position to enforce the statutory and constitutional policies prohibiting racial discrimination." *People v Bell*, 473 Mich 275, 287; 702 NW2d 128 (2005), amended 474 Mich 1201 (2005). The *Knight* court emphasized this point, and the obligations a trial court must meet as a result:

> When a trial court methodically adheres to *Batson*'s three-step test and clearly articulates its findings on the record, issues concerning what the trial court has ruled are significantly ameliorated. Not only does faithful adherence to the *Batson* procedures greatly assist appellate court review, but the parties, the trial court, and the jurors are well-served by thoughtful consideration of each of *Batson*'s steps as well. Thus, we observe that *Batson*, as a constitutional decision, is not discretionary. Our trial courts must meticulously follow *Batson*'s three-step test, and we *strongly* urge our courts to *clearly* articulate their findings and conclusions on the record. [*Knight*, 473 Mich at 338-39 (citation omitted).]

While it is clear that the administration of the three-step *Batson* test is the responsibility of the trial court,[3] what is less clear from the caselaw is what is enough to signal to the trial court to start that three-step process. But, whatever that bar is, defense counsel's actions in this case were sufficient, albeit not exemplary, to at least trigger the process. Further, given that the trial court found that trial counsel failed to present a prima facie showing of discrimination as to Juror 11, the first step in the *Batson* inquiry, we will review questions of law de novo and factual findings for clear error. *Knight*, 473 Mich at 343.

After a wholly unproblematic voir dire in which Juror 11, a Black man, stated that he would faithfully adhere to the beyond-a-reasonable-doubt standard, that he would not hold child witnesses or police officers to different standards, that he would not allow sympathy or speculation or race to enter his decisions, and that he was the type of person he would want on a jury, Juror 11 was peremptorily dismissed by the prosecutor. Immediately after that dismissal, defense counsel requested to approach the bench. Once there, the following exchange between defense counsel and the trial court occurred:

> *Defense Counsel*: Your Honor, I just—I don't (sic) that there was anything that came out of [Juror 11]'s testimony that, you know, obviously peremptory we have whatever reason. But, I'm just concerned about a potential *Batson* issue.
>
> *The Court*: Well, it's—was there another person that was a minority that [the prosecution] struck, or was this the first person that's a minority that he struck?
>
> *Defense Counsel*: I think it's the first, your Honor.
>
> *The Court*: All right. Then a *Batson* wouldn't apply in this scenario. Anything else we can address outside the presence of the jury? Unless you have any argument you want me to be aware of right now?
>
> *Defense Counsel*: No, I just wanted to place that concern on the record, your Honor. Thank you.
>
> *The Court*: All right. Thank you.

To begin, the initial statement from defense counsel could alone be enough to meet the prima facie evidence standard of the first prong of the *Batson* test:

> To establish a prima facie case of discrimination based on race, the opponent must show that: (1) he is a member of a cognizable racial group; (2) the proponent has exercised a peremptory challenge to exclude a member of a certain racial group

---

[3] See also *Flowers v Mississippi*, 588 US 284, 302; 139 S Ct 2228; 204 L Ed 2d 638 (2019) ("[T]he job of enforcing *Batson* rests first and foremost with trial judges. . . . In criminal trials, trial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process.").

from the jury pool; and (3) all the relevant circumstances raise an inference that the proponent of the challenge excluded the prospective juror on the basis of race. [*Knight*, 473 Mich at 336.]

That Juror 11 and Rodriguez were both minorities was apparent to the parties and the trial court. The court knew from pretrial hearings that Rodriguez was from Mexico and spoke Spanish.[4] And, the trial court's response to defense counsel illustrates the trial court's knowledge as to Juror 11's membership in a cognizable racial group: "was there *another* person that was a minority that [the prosecution] struck, or *was this the first person that's a minority* that he struck?" And, defense counsel likewise explained that Juror 11's "testimony" (i.e. the unproblematic responses to voir dire) was what raised an inference that the juror may have been excluded on the basis of race. Whether or not defense counsel made her prima facie case in full at this point, defense counsel did enough to signal to the trial court it was time to start the three-step *Batson* inquiry that the court "must meticulously follow." *Knight*, 473 Mich at 339.

The trial court failed to duly discharge that obligation and instead made an error of law that prematurely ended the inquiry. The trial court made a single inquiry after defense counsel observed a "potential *Batson* issue"—was Juror 11 the first minority dismissed? Once defense counsel answered in the affirmative, the trial court made a legally incorrect ruling that *Batson* did not apply because it was "the first person that's a minority that [the prosecutor] struck."[5] After making that legally erroneous ruling, the trial court asked, "Anything else we can address outside the presence of the jury? Unless you have any argument you want me to be aware of right now?" to which defense counsel responded, "No, I just wanted to place that concern on the record, your Honor."

At the post-trial motion hearing, the trial court referred to the above-excerpted exchange as "a shot across the bow of the prosecutor" and "a discussion among the [c]ourt and the lawyers [rather] than an objection and a ruling." In its post-trial order denying a new trial or evidentiary hearing, the trial court said that counsel "was not denied an opportunity to make a prima facie case" and was, "in this 36 second exchange . . . provided the opportunity to pursue the issue further, but Defendant chose not to." These descriptions are belied by the transcript, which clearly shows that the trial court made a legal ruling that ended the *Batson* inquiry, and that defense counsel understood it as such. To the extent the trial court intended otherwise, it was the court's

---

[4] Because Officer Gasca testified that Rodriguez gave her a Mexican passport as identification, the trial court was aware that Rodriguez is from Mexico. And while Juror 11 and Rodriguez may have been members of different racial groups, "a defendant may raise a *Batson* claim even if the defendant and the excluded juror are of different races." *Flowers*, 588 US at 301 (citations omitted).

[5] At oral argument on the post-trial motion, the trial court conceded that "you don't get a freebie of excusing someone for a racially motivated reason," which is correct. *Knight*, 473 Mich at 337 n 9 (recognizing that "striking of even a single juror on the basis of race violates the Constitution"). But the trial court did not concede that is what it had ruled. Instead, the trial court said defense counsel was "reading too much into what I said."

obligation to be "methodical," "meticulous," and "clear" in its handling of the matter. *Knight*, 473 Mich at 338-339. On this record, we cannot conclude it was.

In its post-trial order, the trial court also made much of defense counsel's use of the word "concern" but that ignores that counsel first used the word "issue" which is the exact language employed in caselaw as to raising and preserving jury-related claims. See, e.g., *People v McKinney*, 258 Mich App 157, 161; 670 NW2d 254 (2003) (emphasis added) ("[T]o properly preserve a challenge to the jury array, a party must *raise this issue* before the jury is empaneled and sworn."). In *Knight*, the trial court repeatedly employed the word "issue" to refer to the dismissal of minority jurors. *Id*. at 331-332. And more fundamentally, we fail to see why the trajectory or disposition of this constitutional question would turn on counsel's use of "concern" when raising it; to conclude as much would be to elevate "magic words" over the relevant law— which defense counsel cited—and the duty of our courts to apply that law to maintain "public confidence in the fairness of our system of justice." *Batson*, 476 US at 87.

Here, although defense counsel could have asserted the *Batson* issue in a clearer and more developed fashion, defense counsel did enough to trigger the *Batson* procedure that the trial court is required to follow. The trial court failed to duly discharge its obligation under that procedure and instead committed an error of law that ended the inquiry prematurely. Because the trial court substantially failed to apply the *Batson* framework, we remand for an evidentiary hearing so the trial court can make the required factual findings regarding Rodriguez's preserved claim and determine whether relief is warranted. See *People v Tennille*, 315 Mich App 51, 73-75; 888 NW2d 278 (2016); see also *id*. at 75 (explaining that "[i]f the trial court concludes that defendants proved purposeful discrimination or the court is unable to reach a conclusion because of the passage of time, defendants' convictions must be vacated and a new trial ordered.").

## III. RELEVANCY OF TESTIMONIES OF DR. BROWN AND CRAVENS

Although remand is required with respect to Rodriguez's Batson claim, for the sake of judicial efficiency, we will proceed to address now Rodriguez's other claims on appeal. We do not see in those claims any basis for relief. First, Rodriguez argues that the overall testimonies of Dr. Brown and Cravens were irrelevant and improperly created an inference of a thorough, credible investigation conducted by highly qualified persons thereby bolstering the veracity of the allegations. We disagree.

Rodriguez objected to Cravens providing the name of the perpetrator but otherwise did not object to the testimonies of Dr. Brown or Cravens based on relevance[6]; therefore, absent plain error, he is not entitled to relief. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130

---

[6] Defense counsel objected to Cravens's testimony based on hearsay, arguing that EM's statements to Cravens about the identity of her abuser were not admissible under MRE 803(4), which creates an exception to the prohibition against hearsay for statements made for medical treatment or diagnosis. The parties argued this point at length outside the presence of the jury, and, ultimately, the trial court overruled Rodriguez's hearsay objection. Rodriguez does not contest that ruling on appeal.

(1999). "[U]nder the plain error rule, three requirements must be met: 1) [the] error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. at 763. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. If all three requirements are satisfied, then this Court still has discretion in its final decision. *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (cleaned up).

Under MRE 402, except as otherwise provided, "[a]ll relevant evidence is admissible" at trial. Conversely, "[e]vidence which is not relevant is not admissible." MRE 402.[7] At the time of trial, MRE 401 defined "relevant evidence" as evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Under this broad definition, evidence is admissible if it is helpful in throwing light on any material point." *People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001). "[T]he relationship of the elements of the charge, the theories of admissibility, and the defenses asserted governs what is relevant and material." *People v Brooks*, 453 Mich 511, 520; 557 NW2d 106 (1996) (quotation marks and citation omitted).

A trial court may exclude relevant evidence when the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. "MRE 403 does not prohibit prejudicial evidence; rather, it prohibits evidence that is *unfairly* prejudicial," and "evidence is unfairly prejudicial when there exists a danger that marginally probative evidence might be given undue weight by the jury." *People v Dixon-Bey*, 321 Mich App 490, 513; 909 NW2d 458 (2017) (citations omitted).

In childhood sexual assault cases, Michigan law is clear that generally "(1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty." *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995), amended 450 Mich 1212 (1995). However,

> (1) an expert may testify in the prosecution's case in chief regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim, and (2) an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility. [*Id*. at 352-353.]

---

[7] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of trial.

Additionally, "the prosecution may present evidence, if relevant and helpful, to generally explain the common postincident behavior of children who are victims of sexual abuse." *Id*. at 373. In summary, while expert testimony can provide valuable context and explain typical behaviors of child sexual abuse victims, it must not cross the line into vouching for the victim's credibility or opining on the defendant's guilt.

In the present case, Rodriguez does not directly argue on appeal that either Dr. Brown or Cravens (1) testified that the sexual abuse occurred, (2) expressly vouched for EM's credibility, or (3) testified that Rodriguez is guilty. Rather, Rodriguez argues that because these witnesses did not physically examine EM or provide a diagnosis of EM on the record, the only purpose of their testimonies was the impermissible general bolstering of EM's credibility by lending her allegations "the aura of expertise."

Rodriguez has failed to show error on this basis. At trial, Cravens and Dr. Brown each testified to their respective roles—Cravens, a SANE, and Dr. Brown, a child abuse pediatrician— and their respective training, education, and experience. They also testified to the treatment process they follow when a child alleges sexual abuse; Cravens would typically meet with the child while Dr. Brown would procure medical history from the caregiver, and then with the child's permission, perform a physical exam. And they provided testimony regarding their application of this procedure with EM in this case. Regarding physical examinations, Dr. Brown testified that "it's normal to be nervous and uncomfortable when you go to the doctor" and must remove clothing for an examination. She explained that they "assess willingness" and whether a physical examination is something the child is looking for or whether the child feels it would be too hard to "get through." Dr. Brown further explained that:

> Physical injuries that happen from sexual abuse typically hea[l] very quickly, and without scarring. So, it's unusual for us to find something on an exam that would help . . . to clarify or prove what's going on. So, we really want to be focused on the healing process in that situation. And, if a child is telling us that it's going to be hard for them to cope with an exam, that it's going to make them feel so uncomfortable that they don't want to go through it then we respect that.
>
> On . . . the other hand, we know that some kids are injured. And, we have evidence coming in or report of symptoms where we really do have to look at their body. Those cases are unusual, but in those cases then we talk about are you going to need sedation and is the risk of sedation going to be worth it to try to accomplish the medical care that we need to give to you.

Dr. Brown then confirmed that EM declined a physical examination and that Dr. Brown did not feel it was necessary to pursue one because EM "was not describing anything that made [Dr. Brown] suspect that she currently had an injury in her genital or anal area."

In his closing argument at trial, the prosecutor reiterated to the jury that Cravens and Dr. Brown did not physically examine EM, but argued that it was not surprising that EM declined "to go through that." The prosecutor further argued that, on the basis of Dr. Brown's testimony, Dr. Brown ultimately was "the person who decided that the exam wasn't necessary." Accordingly, Dr. Brown's testimony was relevant to explain EM's specific behavior of declining a physical

-11-

examination that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim, which we find permissible under *Peterson*, 450 Mich at 352. And Rodriguez, for his part, used the testimony of Cravens and Dr. Brown to underscore matters relevant to his theory of defense—namely, both the lack of a physical exam and the absence of any signs of physical abuse.[8] Cravens's and Dr. Brown's testimonies on these topics—and with it, their professional backgrounds and standard practices, which provided material foundation and context for their testimonies—was properly relevant to disputed matters at trial, and Rodriguez has failed to show error in the admission of this evidence on the basis of relevance. And while this evidence may have been prejudicial to Rodriguez, Rodriguez has not shown that it was unfairly so—i.e., that there was "a danger that marginally probative evidence might be given undue weight by the jury"—such that MRE 403 barred its admission despite its relevance. *Dixon-Bey*, 321 Mich App at 513. Thus, we do not see a relief-worthy error in defendant's arguments on appeal.

## IV. PROSECUTORIAL MISCONDUCT

Rodriguez relatedly asserts that the prosecutor committed misconduct by attempting to present the testimonies of Dr. Brown and Cravens because their allegedly irrelevant testimonies served only to improperly bolster EM's credibility. We disagree.

Rodriguez failed to preserve his claim of prosecutorial misconduct, so we review this issue for plain error affecting substantial rights. See *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). "It is the duty of the public prosecutor to see that the person charged with crime receives a fair trial . . . . [The prosecutor's] methods to procure conviction must be such as accord with the fair and impartial administration of justice[.]" *People v Richardson*, 489 Mich 940, 940; 798 NW2d 13 (2011) (quotation marks and citation omitted). "Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). See also *Darden v Wainwright*, 477 US 168, 181; 106 S Ct 2464; 91 L Ed 2d 144 (1986). "The prosecution has wide latitude in arguing the facts and reasonable inferences, and need not confine argument to the blandest possible terms." *Dobek*, 274 Mich App at 66. Claims of prosecutorial misconduct are reviewed "on a case-by-case basis by examining the record and evaluating the remarks in context . . . ." *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010) (cleaned up). "[T]he prosecutor may argue from the evidence, and reasonable inferences from it, to support a witness's credibility." *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021).

The prosecution "may not vouch for the credibility of his or her witnesses" because the "danger is that the jury will be persuaded by the implication that the prosecutor has knowledge that the jury does not and decide the case on this basis rather than on the evidence presented." *People v Bennett*, 290 Mich App 465, 477-478; 802 NW2d 627 (2010). For a vouching issue in

---

[8] In addition, Rodriguez does not dispute that Cravens's testimony regarding EM's statements to her was relevant and admissible in light of Rodriguez's cross-examination of EM on the matter.

the context of prosecutorial misconduct, we "focus on whether the prosecutor elicited the testimony in good faith." *Dobek*, 274 Mich App at 71.

"[I]t is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial." *People v Musser*, 494 Mich 337, 349; 835 NW2d 319 (2013). "[C]redibility matters are to be determined by the jury." *Dobek*, 274 Mich App at 71. "As a result, such statements are considered superfluous and are inadmissible lay witness opinion on the believability of a witness's story because the jury is in just as good a position to evaluate the witness's testimony." *Musser*, 494 Mich at 349 (cleaned up).

In the present case, as discussed, the prosecutor elicited relevant testimony at trial from Dr. Brown and Cravens. While their testimonies may have been broadly relevant to EM's credibility, the prosecutor did not improperly elicit testimony to vouch for EM's credibility and neither witness commented on nor provided an opinion on EM's credibility. *Id*. Rodriguez has not demonstrated bad faith on the part of the prosecutor in the presentation of evidence. *Dobek*, 274 Mich App at 71.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Rodriguez also argues that defense counsel's failure to object to the prosecution's alleged misconduct constituted ineffective assistance of counsel. We disagree.

"A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008) (citation omitted). Because Rodriguez did not obtain an evidentiary hearing, our review is "limited to mistakes apparent on the record." *People v Jackson*, 292 Mich App 583, 600; 808 NW2d 541 (2011). "To establish ineffective assistance of counsel, defendant must first show that (1) his trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008). See also *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 695. "Effective assistance of counsel is presumed and defendant bears the burden of proving otherwise." *Petri*, 279 Mich App at 410.

As discussed previously, the testimonies of Dr. Brown and Cravens were relevant and the prosecution's examination of the medical professionals did not amount to prosecutorial misconduct; accordingly, then, defense counsel was not ineffective for failing to advance a meritless argument.[9] See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

---

[9] Further, we note again that trial attorney *did* object to some of the expert testimony, specifically that they testified as to Rodriguez's identification. Whether the trial court properly admitted that

-13-

## VI.  *BRADY* VIOLATION

Rodriguez asserts that the trial court violated his right to a fair trial by admitting testimony regarding his statements during his November 2021 interview with Officer Gasca because a *Brady* violation occurred.  We disagree.

Our Supreme Court has clearly outlined the legal framework relevant to an alleged *Brady* violation as follows:

> The Supreme Court of the United States held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  In identifying the essential components of a *Brady* violation, the Supreme Court has articulated a three-factor test:
>
> > The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.
>
> Stated differently, the components of a "true *Brady* violation," are that: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material.
>
> The contours of these three factors are fairly settled.  The government is held responsible for evidence within its control, even evidence unknown to the prosecution, without regard to the prosecution's good or bad faith.  Evidence is favorable to the defense when it is either exculpatory or impeaching.  To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  This standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ."  The question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal.  [*People v Chenault*, 495 Mich 142, 149-151; 845 NW2d 731 (2014) (cleaned up).]

The Supreme Court has addressed the issue that arises when a *Brady* claim is based on evidence that no longer exists because of the government's failure to preserve it.  In *Arizona v*

---

testimony as necessary to medical treatment is not raised as a separate issue by defense counsel and so, we decline to address it here.

*Youngblood*, 488 US 51, 58; 109 S Ct 333; 102 L Ed 2d 281 (1988), the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." The *Youngblood* Court reasoned that, although the government's good or bad faith is "irrelevant" under *Brady* when the government "fails to disclose to the defendant material exculpatory evidence," the Due Process Clause requires a different outcome when we consider the failure of the State to preserve evidentiary material that, at best, might have exonerated the defendant. *Id*. at 57.

In the present case, the trial court did not violate Rodriguez's right to a fair trial by admitting testimony regarding his November 2021 interview statements because Rodriguez failed to establish that a *Brady* violation occurred. The record demonstrates that the first element of the *Brady* test was established: it is undisputed that Rodriguez never received the recording of his interview from November 2021, and that this recording was lost before he ever requested the tape. See *Chenault*, 495 Mich at 149.

Regarding the second element, Officer Gasca acknowledged that Rodriguez denied the allegations against him, and the record is devoid of any instances in which Rodriguez alleged that Officer Gasca incorrectly translated his statements. Further, defense counsel conceded that it was "impossible to say" whether the lost recording was exculpatory. Therefore, Rodriguez did not establish the second element of the *Brady* test. See *id*.

Even if Rodriguez could show the deleted recorded interview was favorable, he also failed to establish the third element of the *Brady* test. See *id*. A "reasonable probability that, if the evidence had been disclosed to the defense, the outcome of the proceeding would have been different" did not exist because, as stated in the preceding paragraph, Officer Gasca testified that Rodriguez denied the allegations during the initial interview and Araujo's testimony at trial demonstrated that Rodriguez largely confirmed the statements that he made to Officer Gasca during his interview with Detective Araujo and Detective Cole. *Id*. at 150. There is nothing in the record to suggest that, had the video itself been available, a different outcome at trial would have been reasonably probable. *Id*. at 150.

Moreover, Officer Gasca testified that she intended to preserve the interview recording by uploading it to the department's server after her shift that day, without anticipating that it would be inadvertently destroyed approximately two months later because of a reportedly routine purge. Accordingly, there is no evidence of bad faith or intentional suppression regarding the loss of the recording, and the police's "failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 US at 58. See *People v Amison*, 70 Mich App 70, 81-82; 245 NW2d 405 (1976).[10]

---

[10] Rodriguez also asserts that the police department's failure to preserve evidence violated MCL 780.316(2) of the Law Enforcement Body-Worn Camera Privacy Act, MCL 780.311 *et seq*., which provides that "[a] law enforcement agency shall retain audio and video recordings that are the subject of an ongoing criminal or internal investigation . . . until the completion of the ongoing investigation or legal proceeding." It is undisputed that Rodriguez never received the recording

## VII. HEARSAY EVIDENCE

Rodriguez argues next that the trial court abused its discretion by admitting his statements, as testified about by Officer Gasca and Detective Araujo, because the officers acted as his interpreters under MCL 775.19a, and he did not adopt their translations of his statements, rendering them inadmissible hearsay under the language-conduit rule. We disagree.

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *People v Thorpe*, 504 Mich 230, 251; 934 NW2d 693 (2019). "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls outside the range of principled outcomes. A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*. at 251-252 (quotation marks and citations omitted). "We review de novo preliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, and it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *People v Smith*, 336 Mich App 79, 106; 969 NW2d 548 (2021).

At the time relevant to this appeal, MRE 801(c) defined "hearsay" as a statement "other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(d) provided that certain statements were not hearsay. MRE 801(d)(2), provided, in relevant part, that an admission by a party-opponent was not hearsay if

> [t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity . . . or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

The "language conduit rule" is a doctrine "under which an interpreter is considered an agent of the declarant, not an additional declarant, and the interpreter's statements are regarded as the statements of the declarant without creating an additional layer of hearsay." *Jackson*, 292 Mich App at 595.

The *Jackson* Court used the following test to determine whether statements made through an interpreter are admissible under the language-conduit rule:

---

of his interview from November 22, 2021, and that this recording was deleted before he ever requested the tape for trial. However, the statute does not mandate that a violation of the statute entitles a defendant affected by the violation to a dismissal of criminal charges. "[B]ecause the statute does not specify a remedy, dismissal is not warranted for a statutory violation." *People v Anstey*, 476 Mich 436, 440; 719 NW2d 579 (2006). Furthermore, even if the statute was violated, there is no evidence that it was violated in bad faith, and Rodriguez is not entitled to a presumption that the department acted in bad faith. See MCL 780.316(4).

[A] court should consider (1) whether actions taken after the conversation were consistent with the statements translated, (2) the interpreter's qualifications and language skill, (3) whether the interpreter had any motive to mislead or distort, and (4) which party supplied the interpreter. [*Jackson*, 292 Mich App at 596.]

MCL 775.19a provides the standard upon which trial courts must appoint an interpreter:

If an accused person is about to be examined or tried and it appears to the judge that the person is incapable of adequately understanding the charge or presenting a defense to the charge because of a lack of ability to understand or speak the English language, the inability to adequately communicate by reason of being mute, or because the person suffers from a speech defect or other physical defect which impairs the person in maintaining his or her rights in the case, the judge shall appoint a qualified person to act as an interpreter.

First, the trial court did not err by determining that MCL 775.19a was inapplicable. See *Smith*, 336 Mich App at 106. This Court has not interpreted this statute to apply to settings outside of the context of legal proceedings, including during the pretrial criminal investigation. See *People v Hieu Van Hoang*, 328 Mich App 45, 56; 935 NW2d 396 (2019). Additionally, the officers were not acting as Rodriguez's qualified interpreting agents during his interviews under MCL 775.19a because they acknowledged their lack of licensure to do so, and the record demonstrates that they were not "appointed" by the trial court as required in MCL 775.19a. Therefore, the trial court did not err by determining that MCL 775.19a was inapplicable. See *Smith*, 336 Mich App at 106.

Second, the trial court did not err by determining that the language-conduit rule was not required for the admission of the testimonies of Officer Gasca and Detective Araujo. In *Jackson*, 292 Mich App at 594-597, the language-conduit rule applied because the interpreter in question did not testify at trial, and the *Jackson* Court conducted an analysis of the language-conduit rule to determine whether the prosecution needed to overcome a second layer of hearsay because her report was submitted in place of her testimony. Distinguishably, in the present case, the record supports, and it is undisputed, that the alleged interpreters, Officer Gasca and Detective Araujo, testified at trial and were confrontable by Rodriguez, negating the application of the language-conduit rule as applied in *Jackson*. See *id*.

Finally, the trial court did not err in concluding the officers' testimonies about Rodriguez's statements were admissible. A defendant's own prior statements are not hearsay. MRE 801(d)(2)(A). In order for the officers to testify about Rodriguez's statements at trial, the prosecutor introduced sufficient evidence to support a finding that the officers had personal knowledge of Rodriguez's statements. See MRE 602. In other words, the prosecutor was required to, and did, show that the officers were familiar with, and competent in, Rodriguez's primary language under MRE 602. To the extent that the officers' testimonial descriptions in English of what Rodriguez stated in Spanish was an opinion, their testimonies were permissible under MRE 701 as opinion testimony of a lay witness because it was "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." MRE 701. The record demonstrates that the requirements of MRE 701 were met through the officers' previously discussed testimonies regarding their fluency

in Spanish and ability to understand Rodriguez's statements to them. Rodriguez had the opportunity at trial to contest the credibility and weight that the jury should afford the officers' testimonies regarding his interview statements, and while he stresses that his ability to do so was limited because he did not have a video of his first interview, he has not substantiated that proposition or shown how the absence of the video alone would have been enough to render the testimonies inadmissible in this case. Rodriguez has failed to show that the trial court committed reversible error in the handling of this issue.

## VIII. CONCLUSION

We remand for the trial court to conduct an evidentiary hearing on the *Batson* issue and to treat the same as preserved. We retain jurisdiction.

/s/ Philip P. Mariani
/s/ Adrienne N. Young

# Court of Appeals, State of Michigan

# ORDER

PEOPLE OF MI V JUAN CARLOS RODRIGUEZ

Docket No.    367868

LC No.      2022-000570-FC

Philip P. Mariani
Presiding Judge

Allie Greenleaf Maldonado

Adrienne N. Young
Judges

---

For the reasons stated in the opinion issued with this order, we REMAND this case for further proceedings. We retain jurisdiction. After the remand proceedings conclude, we will review the decisions that the trial court made during those proceedings and consider any remaining issues in this appeal. Any challenges to the trial court's decisions on remand must be raised in this appeal. Therefore, the parties and the trial court must not initiate a new appeal from an order entered on remand within the scope of this appeal. The Clerk of the Court is directed to reject the initiation of a new appeal from such an order.

Appellant must initiate the proceedings on remand, and the trial court should prioritize this matter until the proceedings are concluded. As stated in the accompanying opinion, the trial court on remand is to conduct an evidentiary hearing to make the required factual findings regarding appellant's preserved Batson-error claim. The proceedings on remand are limited to this issue.

The parties must serve copies of their filings in the trial court on this Court. Appellant must file with this Court copies of all orders entered on remand within seven days of entry.

Appellant must ensure the transcript of all proceedings on remand is filed in the trial court and this Court within 21 days after completion of the proceedings.

Appellant may file a supplemental brief addressing issues resulting from the remand proceedings within 21 days after the entry of the trial court's order deciding the matter or the filing of the transcript of the remand proceedings in the trial court, whichever is later. If appellant does not file a supplemental brief, appellee may file a supplemental brief within 21 days after appellant's time for filing has run. A responsive brief may be filed within 14 days of service of the supplemental brief.

_____
Presiding Judge

Maldonado, J., respectfully dissents.



A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

_____October 17, 2025_____
Date

_____
Chief Clerk